ROBBINS GELLER RUDMAN
  & DOWD LLP
SAM S. SHELDON (190502)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
ssheldon@rgrdlaw.com

Attorneys for Plaintiff-Relator

[Additional counsel appear on signature page.]

**F I L E D**
CLERK, U.S. DISTRICT COURT

3/7/25

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cs _____ DEPUTY

Fee Paid

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

UNITED STATES OF AMERICA, and the STATE OF CALIFORNIA

*ex rel.* [SEALED],

              Plaintiff-Relator,

     vs.

[SEALED],

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV25-2061-AH(MAAx)

*SEALED*

RELATOR'S **SEALED** *QUI TAM* COMPLAINT

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)**

**DO NOT PLACE ON PACER**

DEMAND FOR JURY TRIAL

**FILED UNDER SEAL PURSUANT TO THE FEDERAL
FALSE CLAIMS ACT, 31 U.S.C. §3730(b)**

ROBBINS GELLER RUDMAN
    & DOWD LLP
SAM S. SHELDON (190502)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
ssheldon@rgrdlaw.com

Attorneys for Plaintiff-Relator

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF CALIFORNIA<br><br>*ex rel.* CFV 2025 LLC,<br><br>               Plaintiff-Relator,<br><br>      vs.<br><br>CHOICE HOTELS INTERNATIONAL, INC., HILTON WORLDWIDE HOLDINGS, INC., HYATT HOTELS CORPORATION, INTERCONTINENTAL HOTELS GROUP PLC, MARRIOTT INTERNATIONAL, INC., WYNDHAM HOTELS & RESORTS, INC., and CORPORATE LODGINGS CONSULTANTS, INC.,<br><br>               Defendants. | Case No.<br><br>*SEALED*<br><br>RELATOR'S **SEALED** *QUI TAM* COMPLAINT<br><br>**FILED UNDER SEAL** PURSUANT TO 31 U.S.C. §3730(b)<br><br>**DO NOT PLACE ON PACER**<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**FILED UNDER SEAL PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3730(b)**

Relator CFV 2025 LLC, on behalf of itself, the United States of America, and the State of California, brings this action against Choice Hotels International, Inc., Hilton Worldwide Holdings, Inc., Hyatt Hotels Corporation, InterContinental Hotels Group PLC, Marriott International, Inc., Wyndham Hotels & Resorts, Inc., and Corporate Lodgings Consultants, Inc. for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §3729 *et seq.*, and the California False Claims Act ("CFCA"), Cal. Gov't Code §12650 *et seq.*, to recover all damages, civil penalties, and other recoveries provided for under those statutes.

## JURISDICTION AND VENUE

1.     Jurisdiction is founded upon the FCA, 31 U.S.C. §3729 *et seq.*, specifically 31 U.S.C. §3732(a) and (b), and also upon 28 U.S.C. §§1331 and 1345. This Court has subject matter jurisdiction over Relator's state law claims pursuant to 28 U.S.C. §1367(a) and 31 U.S.C. §3732(b).

2.     Venue in the Central District of California is appropriate under 31 U.S.C. §3732(a) in that, at all times material to this civil action, the Defendants have all transacted business in the Central District of California and have submitted or caused the submission of false claims relating to hotel stays in the Central District of California.

3.     Relator is providing the United States with a full written disclosure of substantially all material facts, as required by the FCA, 31 U.S.C. §3730(b)(2). Relator is also providing the State of California a written disclosure of all material evidence and information, as required by Cal. Gov't Code §12652(c).

## SUMMARY OF THE ACTION

4.     Relator CFV 2025 LLC is wholly owned and managed by a Pasadena, California resident who was displaced during the Los Angeles area wildfires of early 2025 ("Displaced"). Displaced's home suffered significant smoke damage and he and his pregnant wife remain unable to occupy their home as of the date of filing this Complaint.

- 1 -

5. Like many members of his community who suffered similar losses, Displaced applied and was approved for emergency support from the Federal Emergency Management Agency ("FEMA"), specifically including free hotel stays under the Transitional Sheltering Assistance Program (or the "Program").

6. Under the Program, FEMA pays participating hotels to house individuals who have had to flee their homes.

7. FEMA makes clear that these hotels cannot require individuals to provide a credit card or cash deposit to secure a room at check in. FEMA also makes clear that the Program covers taxes, as well as certain non-refundable pet fees, and that properties are not to bill FEMA guests for any taxes or generalized resort or destination fees made an inherent part of the room price. In contrast, fees for specific, additional services that guests may request – parking, laundry, room service, etc. – are the responsibility of the guests rather than FEMA.

8. Based on his own personal experience, Displaced discovered that many participating hotels blatantly violate these FEMA rules – particularly with respect to demanding cash or credit card deposits at check in.

9. These are not just accidents or oversights. Hotels demand deposits from Program beneficiaries as a form of gatekeeping, and self-serving risk mitigation. Hotel guests without the financial wherewithal to make cash deposits or absorb credit holds on their credit cards are turned away, undermining FEMA's goal of limiting the number of survivors who must rely on congregate shelters such as school gyms and church basements after a natural disaster.

10. These policies have disproportionately impacted members of poor and minority communities who have had to evacuate their homes and have been less able to afford deposits, taxes, and resort fees than other area residents.

**PARTIES**

11. Relator CFV 2025 LLC is a Delaware limited liability company with its principal place of business as 680 East Colorado Boulevard, Suite 180, Pasadena,

California 90021.  Displaced is the sole member and manager of Relator and is authorized to act on its behalf.

12.     Choice Hotels International, Inc. ("Choice Hotels") is a publicly traded Delaware corporation with a principal office address of 1 Choice Hotels Circle, Suite 400, Rockville, Maryland 20850.  Choice Hotels owns numerous hotel brands that operate in the greater Los Angeles area including Clarion, Comfort Inn, Rodeway Inn, and Quality Inn.

13.     Hilton Worldwide Holdings, Inc. ("Hilton") is a publicly traded Delaware corporation with a principal office address of 7930 Jones Branch Drive, McLean, Virginia 22102.  Hilton owns numerous hotel brands that operate in the greater Los Angeles area including Hilton, Embassy Suites, Hampton Inn and Suites, Hilton Garden Inn, and Homewood Suites.

14.     Hyatt Hotels Corporation ("Hyatt") is a publicly traded Illinois corporation with a principal office address of 150 North Riverside Plaza, 8th Floor, Chicago, Illinois 60606.  Hyatt owns numerous hotel brands that operate in the greater Los Angeles area including Hyatt, Hyatt Place, and Park Hyatt.

15.     InterContinental Hotels Group PLC ("IHG") is a publicly traded British corporation with an American headquarters address of 3 Ravina Drive #100, Atlanta, Georgia 30346.  InterContinental owns numerous hotel brands that operate in the greater Los Angeles area including Holiday Inn, Candlewood Suites, and Crowne Plaza.

16.     Marriott International, Inc. ("Marriott") is a publicly traded Maryland corporation with a principal office address of 7750 Wisconsin Avenue, Bethesda, Maryland 20814.  Marriott owns numerous hotel brands that operate in the greater Los Angeles area including Marriott, Courtyard, Residence Inn, Sheraton, and TownePlace Suites.

17.     Wyndham Hotels & Resorts, Inc. ("Wyndham") is a publicly traded New Jersey company with a principal office address of 22 Sylvan Way, Parsippany,

New Jersey 07054. Wyndham owns numerous hotel brands that operate in the greater Los Angeles area including Super 8, Days Inn, Travelodge, La Quinta, Baymont, and Ramada.

18. Corporate Lodgings Consultants, Inc. ("CLC") is a lodging management company originally based out of Wichita, Kansas. In 2009, CLC was purchased by Fleetcor Technologies, which subsequently changed its name to Corpay, Inc. CLC currently has a principal office address of 3280 Peachtree Road, Suite 2400, Atlanta, Georgia 30305.

19. The United States is a party to this action, and Relator brings this action on behalf of the United States of America (hereafter "United States") as well as Relator's own behalf. The United States is a plaintiff on behalf of the U.S. Department of Homeland Security, and FEMA.

20. The State of California is also a party to this action. By law, payments made under the Transitional Sheltering Assistance Program are split between the state and federal governments. The United States pays 75% of the cost, while the state requesting the federal emergency declaration – in this case California – is responsible for the remainder of the cost. Accordingly, fraud perpetrated by Defendants with respect to the Transitional Sheltering Assistance Program implicates both federal and California state funds.

## GOVERNING LAW

**The Federal False Claims Act ("FCA")**

21. The FCA provides, in part, that any person who: (i) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (ii) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties. 31 U.S.C. §3729(a)(1)(A)-(B).

22. A person acts "knowingly" under the FCA when he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of

- 4 -

the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A). No proof of specific intent to defraud is required by the FCA. 31 U.S.C. §3729(b)(1)(B).

23. FCA violations may result in civil penalties of between $5,500 and $11,000 per false claim – subject to any applicable adjustment in the range of penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 – plus three times the amount of damages sustained by the government as a result of the Defendants' illegal conduct. 31 U.S.C. §3729(a).

**The California False Claims Act ("CFCA")**

24. Like its federal counterpart, the CFCA provides that any person who: (i) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (ii) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the State of California for damages and penalties. Cal. Gov't Code §12651.

25. A person acts "knowingly" under the CFCA when he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." Cal. Gov't Code §12650(b)(3). No proof of specific intent to defraud is required by the CFCA.

26. CFCA violations may result in civil penalties of between $5,500 and $11,000 per false claim – subject to any applicable adjustment in the range of penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 – plus three times the amount of damages sustained by the government as a result of the Defendants' illegal conduct. Cal. Gov't Code §12650(a).

- 5 -

**The Stafford Act and the Transitional Sheltering Assistance Program**

27.    The Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§5121-5148 ("Stafford Act"), provides the statutory authority for the federal disaster response activities of FEMA.

28.    Congress enacted the Stafford Act to provide "assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from [major] disasters."  42 U.S.C. §5121(b).

29.    The Stafford Act is designed to assist the efforts of a State affected by natural disaster by "expediting the rendering of aid, assistance, and emergency services, and the reconstruction and rehabilitation of devastated areas."  42 U.S.C. §5121(a).  Once the Governor of an affected State asks the President to declare a "major disaster" and the President does so, the Stafford Act authorizes the President to direct public assistance to the disaster area.

30.    One form of public assistance that may be authorized is financial support for short-term hotel stays for disaster survivors whose homes are either uninhabitable or inaccessible due to disaster-related damage.  42 U.S.C. §5170b(a)(3)(B).

31.    By statute, the "Federal share" of such assistance "shall be not less than 75 percent" of the eligible cost, with the State responsible for the remaining share. 42 U.S.C. §5170b(b).

32.    The goal of this hotel subsidy is to reduce the number of survivors housed in governmental and non-profit congregate shelters.

33.    The initial period of assistance under the Program is typically 5 to 14 days from the date the Program is authorized by FEMA's Assistant Administrator for Disaster Assistance.  The period of assistance may be extended, in 14-day intervals, up to 6 months from the date of declaration upon request by the State.

- 6 -

34.     Participation by hotels is entirely voluntary, and eligible survivors may choose to stay at any approved hotel or facility identified by FEMA.  FEMA will cover the cost of the room and any associated taxes, while the survivor is responsible for food, parking, laundry, and similar incidental costs.

35.     When an applicant checks in to a participating hotel, the applicant signs a Transitional Sheltering Assistance Terms and Conditions form.  One of the terms included on that form specifically states that the applicant understands that "***I am not required to provide the hotel with a credit card or a cash deposit to secure the room at check-in***" (emphasis added).

36.     This prohibition against requiring a deposit at check-in is an important FEMA requirement.  Not all applicants will have enough money on hand to provide a deposit – regardless of whether those funds are ultimately refunded at the end of the stay.  Even applicants who do have sufficient funds may not have them immediately accessible, due to the very same disaster conditions that required them to flee their homes in the first place.

37.     When hotels impose unlawful deposit requirements, they enrich themselves while robbing FEMA of the benefit of its bargain.  In the aftermath of a natural disaster, demand for lodging from traditional business and leisure travelers drops.  FEMA-funded stays help to offset this loss, which is a major reason why hotels participate in the Program.  Hotels that believe they can maintain high occupancy without accepting FEMA's terms, conditions, and reimbursement rates are under no obligation to participate; the Program is entirely voluntary.

38.     However, once a hotel chooses to participate, it must follow the terms of its deal.  One of those terms is that the hotel is not allowed to discriminate against the poorest and neediest FEMA beneficiaries.

39.     Most participating hotels would prefer to shelter only well-heeled disaster survivors.  There is less economic risk (*e.g.*, if there is damage to the room).  And

- 7 -

wealthier guests are more likely to spend money on ancillary services such as food, alcohol, and parking.

40.    While hotels might prefer to limit guests in that way, that is not the deal that FEMA offered.  Instead, FEMA makes quite clear that participating hotels must make their rooms available to survivors regardless of their ability to pay a cash deposit or accept a credit card hold.

41.    Hotels that have enrolled in the Program without any intention of following its requirements have taken the benefits while shifting the burdens back onto FEMA, as well as to overburdened community shelters and those hotel properties that have actually followed the law.

<strong>FACTS</strong>

**Displaced Loses His Home and Seeks out Temporary Shelter Assistance, Finds Hotels Repeatedly Violating Required FEMA Terms**

42.    Displaced is a Los Angeles area resident.

43.    During the intense wildfires of early 2025, Displaced, along with many other Angelenos, lost his home and was required to seek short-term, temporary shelter.  By any measure, this disaster was one of the worst in California history.  An estimated 10,000 homes were lost, entire neighborhoods were suddenly, violently uprooted, and rebuilding costs are predicted to be in the tens of billions of dollars.

44.    The Governor of California requested a major disaster declaration, and the President approved that Declaration on January 8, 2025.  Accordingly, Displaced became eligible for FEMA public assistance including assistance under the Program.

45.    Using the list of participating hotels available at www.femaemergencyhotels.com, Displaced identified and ultimately stayed at several different hotels over the ensuing weeks.

46.    Displaced was dismayed to find that many participating hotels in the area did in fact require cash or credit card deposits in order to secure a room – even as those hotels presented Displaced and other FEMA-funded guests with Terms and

Conditions forms to sign that expressly stated that guests were under no such obligation.  Some of these hotels also stated that Program participants had to pay applicable taxes themselves, which is also in violation of FEMA rules.

47.   The violations of these FEMA rules appeared rampant among the participating hotel properties.

48.   For example, on January 24, 2025, Displaced checked into the AC Marriott Beverly Hills at 6399 Wilshire Boulevard, Los Angeles, California 90048.  AC Marriott is one of the brands owned by Defendant Marriott.

49.   When Displaced checked in, he was presented with FEMA's standard Transitional Sheltering Assistance Terms and Conditions form to sign and give back to hotel reception.  Under applicable Program rules, a hotel could not bill CLC, FEMA's payment agent, without submitting a signed copy of the form.

50.   One of the explicit terms on that form was that "I am not required to provide the hotel with a credit card or a cash deposit to secure the room at check in."

51.   Despite this express language, the front-desk clerk told Displaced that there actually was a required deposit of several hundred dollars to cover incidentals.

52.   Displaced stayed at this hotel for several weeks, with a planned check out on February 12, 2025.

53.   In the days leading up to check out, Displaced called a few other participating hotels to ask about availability and what their terms were.  Like the AC Marriott, many of these properties stated that a deposit was required to check in, and some also said that the guest was still responsible for taxes and other mandatory fees.

54.   Displaced's understanding was that demanding a deposit or guest payment of taxes was prohibited by FEMA under the Program, so on February 11, 2025, Displaced called the FEMA Helpline ((800) 621-FEMA) to seek clarification on what hotels could and could not require from FEMA guests.

55.   The hotline operator expressed frustration when Displaced told him about his calls to other participating hotels and confirmed that those hotels were not allowed

- 9 -

to charge taxes or collect deposits. However, the operator also told Displaced that there was no real mechanism to ensure compliance and that if making a deposit or paying taxes was too burdensome, then Displaced should search for a participating hotel that complied with Program rules.

56.     On February 12, 2025, Displaced checked out of the AC Marriott Beverly Hills and checked into the Kimpton Hotel Palomar Beverly Hills located at 10740 Wilshire Boulevard, Los Angeles, California, another hotel participating in the Program.

57.     The violations of FEMA rules that Displaced found at the Kimpton Hotel Palomar were even more extreme than those at the AC Marriott. For one, the Kimpton insisted on a credit card hold of $200 per day, up to a maximum of $1,400. Second, the hotel charged a "guest amenity fee" of $40 per day, regardless of whether the guest used any amenities or not. Third, despite express language in the terms and conditions sheet saying that "FEMA will pay the nightly room rate and taxes" the Kimpton still charged Displaced both a "City Occupancy Tax" and "CA Tourism Assessment" tax.

58.     Kimpton is an IHG property. The Kimpton Hotel Palomar's website describes the property as an "elite boutique LA hotel with the enviable location highlighted by luxurious designer-selected materials from the lobby to the pool to your guest room." It further describes itself as "mesh[ing] the intimacy of a stylish private residence with the vibe of a social club" and boasts that its guests will consider themselves "lucky to be on Wilshire Blvd."

59.     Given the self-described high-end ambiance of the hotel, it is perhaps not surprising that the property preferred catering to guests with the ability to pay taxes and amenity fees and to make large credit-card deposits to cover incidentals.

60.     If keeping other types of guests away was a priority, then the hotel was under no obligation to participate in the Program at all. However, what it was not permitted to do was to use taxes, fees, and deposits as an unlawful gatekeeper,

- 10 -

allowing in some wildfire survivors – *i.e.*, the more affluent ones – and the federal money that followed them, while keeping out the poorer guests who might undermine the hotel's "elite boutique" vibe.

**Displaced Discovers Just How Widespread These Violations Are**

61.     During this same period in early February, Displaced investigated other participating hotels in the Los Angeles area, to see if there were particular companies or brands that followed the FEMA rules any better or more consistently.

62.     What Displaced found from this process was a pattern of repeated violations by some of the biggest hotel chains in the country.

63.     For example, phone calls made to participating Choice Hotel properties on February 12 and 13, 2025 uncovered numerous violations of FEMA rules, including:

(a)     The Comfort Inn Santa Monica, located at 2815 Santa Monica Boulevard, Santa Monica, California, requiring FEMA guests to provide either a $125 credit card deposit or a $250 cash deposit at check in;

(b)     The Comfort Inn & Suites John Wayne Airport, located at 2620 Hotel Terrace, Santa Ana, California, requiring FEMA guests to provide either a $101 credit card deposit or a $250 cash deposit at check in;

(c)     The Quality Inn & Suites, located at 4922 West Century Boulevard, Inglewood, California, requiring FEMA guests to provide either a $100 credit card deposit or a $200 cash deposit at check in;

(d)     The Woodspring Suites, located at 8740 Spectrum Park Way, Bakersfield, California, requiring FEMA guests to provide a $100 credit card deposit at check in – and stating that cash deposits would not be accepted.

64.     Phone calls made to participating Hilton properties on February 13 and 14, 2025 also uncovered numerous violations of FEMA rules, including:

- 11 -

(a)     The Embassy Suites located at 2120 Main Street, Irvine, California 92614 requiring FEMA guests to make a refundable deposit of $50 per day of the hotel stay to cover incidentals.

(b)     The Hilton Garden Inn located at 988 Via San Clemente, Montebello, California 90640, requiring FEMA guests to make a refundable deposit of $200, with a credit card on file at the time of check in.

(c)     The Home2 Suites Hilton Garden Inn located at 2005 N. Highland Avenue, Los Angeles, California 90068-3238 requiring FEMA guests to make a refundable deposit of $75, with a credit card on file at the time of check in.

(d)     The Homewood Suites located at 5233 Katella Avenue, Cypress, California 90720, requiring FEMA guests to make a refundable deposit of $75, with a credit card on file at the time of check in.

65.     A February 14, 2025 phone call made to Defendant Hyatt's participating Hyatt House Irvine hotel located at 2320 Main Street, Irvine, California 92614 uncovered that the hotel required a $50 per night credit card hold for FEMA guests, up to a maximum of $250.

66.     In addition to the violations that Displaced experienced firsthand at the Kimpton Palomar hotel, calls made to other participating IHG hotels on February 13, 2025 uncovered additional violations of FEMA rules, including:

(a)     The Crowne Plaza Hotel located at 601 South Palos Verdes Street, San Pedro, California requiring FEMA guests to provide a credit card for a $100 incidentals hold at the time of check in.

(b)     The Holiday Inn El Monte located at 9920 Valley Boulevard, El Monte, California 91731 requiring FEMA guests to provide a $50 deposit with a credit card on file at the time of check in.

67.     In addition to the violations that Displaced experienced firsthand at the AC Marriott hotel, calls made to other participating Marriott hotels on February 13 and 14 uncovered additional violations of FEMA rules, including:

- 12 -

(a)     The Courtyard by Marriott located at 6161 West Century Boulevard, Los Angeles, California 90045 requiring FEMA guests to provide a $300 refundable deposit either in cash or by credit card at the time of check in.

(b)     The Towneplace Suites by Marriott LAX located at 4427 West El Segundo Boulevard – Bldg. B, Hawthorne, California 90250 requiring FEMA guests to provide a $150 refundable deposit by credit card at the time of check in.

(c)     The Residence Inn – Cypress located at 4931 Katella Avenue, Los Alamitos, California 90720 requiring FEMA guests to provide a $300 refundable deposit at the time of check in.

68.     Phone calls made to participating Wyndham properties on February 12 and 13, 2025 uncovered numerous violations of FEMA rules at those hotels, including:

(a)     The Howard Johnson Hotel and Conference Center located at 222 West Houston Avenue, Fullerton, California 92832 requiring FEMA guests to provide a $100 refundable deposit with a credit card on file at the time of check in.

(b)     The Ramada Plaza Hotel located at 10022 Garden Grove Boulevard, Garden Grove, California 92844 also stated that FEMA guests had to provide a $100 refundable deposit with a credit card on file at the time of check in.

(c)     The Super 8 located at 915 Disneyland Drive, Anaheim, California 92802 stated that FEMA guests had to provide a $150 refundable deposit with a credit card on file at the time of check in.

(d)     The Travelodge by Wyndham Lynwood, located at 11401 Long Beach Boulevard, Lynwood, California 90262 stated that FEMA guests had to provide a $200 refundable deposit with a credit card on file at the time of check in.

69.     While these major hotel companies were repeatedly ignoring FEMA Program rules, Displaced found that there were other hotel brands in the Los Angeles area that were complying.  For example, phone calls placed to fifteen different

- 13 -

Extended Stay America properties confirmed that none of them required a cash or credit card deposit to check in.

70. Similarly, the only two participating Red Roof Inns both confirmed that they did not require a cash or credit card deposit at check in either.

71. The fact that some companies were able to comply with these Program rules without issue, and that even the Defendant companies were able to comply at some of their properties, shows that this was not an issue of technical feasibility. Defendants could all have complied with these required FEMA conditions.

72. Instead, they chose to accept some FEMA-covered guests to fill otherwise empty rooms, while using the deposit requirement as a gatekeeper to keep out those FEMA-covered guests who did not have the credit or funds available to make those refundable deposits – *i.e.*, the poorest and neediest of the Program participants. This might have been in Defendants' best financial interests, but it was also plainly unlawful.

**CLC Shares Liability with the Individual Hotel Defendants**

73. FEMA and the State of California provide the funding to allow wildfire victims such as Displaced to participate in the Program. However, since 2005, FEMA has contracted with Defendant CLC to actually administer the Program.

74. In this role, CLC handles both Program enrollment for hotel properties and the reimbursement for qualified survivor stays.

75. CLC performs little if any, oversight, to ensure that properties actually comply with FEMA's Program rules.

76. Instead, hotels wishing to participate in the Program enroll online through CLC's Emergency Lodging Assistance website – providing basic information such as hotel name, address, phone number, point of contact, and brand affiliation. The hotel also provides some basic information such as total number of rooms, pet policies, and the availability of in-room refrigerators and stoves.

- 14 -

77.    Hotels may also provide – but are not required to provide – additional information such as applicable taxes and how they are calculated, and any management and ownership company information.

78.    The Program enrollment form does not ask for any information about required deposits for incidentals.

79.    Once the hotel enrolls, it must complete an Emergency Lodging Assistance Payment Contract, at which point it may begin accepting FEMA qualifying survivors and billing CLC.

80.    CLC's Emergency Lodging Assistance website makes clear that in order to be eligible for reimbursement for any particular qualifying survivor stay, the hotel must collect the signed Terms and Conditions form for that qualified survivor.  That form, as noted, explicitly states that the survivor is not required to provide a credit card or cash deposit in order to check in.

81.    Despite this clear language, CLC has failed to establish any mechanisms or controls to ensure that hotels are actually complying with that Program requirement, or the requirement that hotels do not bill taxes or resort/destination fees to the qualified survivor.

**Defendants' Conduct Has Led to the Submission of Materially False Claims for Payment, and Has Not Been Limited to the Los Angeles Area**

82.    The United States, through FEMA, would not have paid the Defendant hotel companies under the Program had FEMA known how brazenly Defendants were using unlawful fees and deposits to keep out FEMA-covered guests they did not want staying at their hotels.

83.    As a condition of billing CLC and receiving reimbursement, participating hotels are required to submit copies of the signed and completed Terms and Conditions form that FEMA guests sign at check in.

84.    That form contains an express statement that "I [the guest] am not required to provide the hotel with a credit card or a cash deposit to secure the room at

- 15 -

check-in." The form contains a separate, express statement that "FEMA will pay the nightly room rate and taxes, as well as non-refundable pet fees, if applicable, for my hotel stay up to the FEMA approved amount for the time I am authorized to remain in the hotel."

85. Defendants have repeatedly and knowingly violated these terms, submitting bills for payment despite requiring prohibited credit card holds and cash deposits.

86. As further evidence that such discrimination by Defendants renders their claims for payment under the Program not just false but materially false, Executive Order 14173 (Jan. 21, 2025) directs the head of every government agency to include in every grant and contract award "[A] term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code." *Id.*, §3(iv)(A).

87. Allowing hotels to require cash or credit card deposits – in violation of clear FEMA rules – also necessarily has a disparate impact on communities of color impacted by the California wildfires.

88. Finally, while Displaced's direct experience has been limited to the Los Angeles area, the scope of Defendants' violations extends far more broadly.

89. The Office of Inspector General for the Department of Homeland Security has been generally aware of CLC's minimal oversight of hotel properties since at least 2020, when it issued its report FEMA Did Not Properly Award and Oversee the Transitional Sheltering Assistance Contract, OIG-20-58 (Aug. 5, 2020). While much of that report focused on improper management of sensitive personal data, it also chastised CLC for primarily relying "on hotels to self-certify their amenities and property details and only conducted basic online research of hotels, if at all." DHS OIG's concern at that time was CLC enrolling hotels that lacked adequate physical amenities – *e.g.*, locking doors, furniture, and individual sanitation facilities.

- 16 -

90. Based on Displaced's experience, it is clear that CLC has not provided any more oversight for hotel compliance with FEMA financial rules than it did for hotels' physical facilities.  As a result, the scope of Defendants' unlawful conduct and submission of false claims extends far more broadly than just the response to the California Wildfire emergency of 2025, but all FEMA designated disasters since 2005 where assistance was provided to survivors under the Program.

## COUNT I

**Violation of the Federal False Claims Act – 31 U.S.C. §3729(a)(1)(A)**
**(Asserted Against Defendants Choice Hotels International, Inc.,**
**Hilton Worldwide Holdings, Inc., Hyatt Hotels Corporation,**
**InterContinental Hotels Group PLC, Marriott International, Inc., and**
**Wyndham Hotels & Resorts, Inc.)**

91. Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

92. This is a claim by Relator, on behalf of the United States of America, for treble damages and penalties under the FCA, 31 U.S.C. §§3729-3733, against Defendants Choice Hotels International, Inc., Hilton Worldwide Holdings, Inc., Hyatt Hotels Corporation, InterContinental Hotels Group PLC, Marriott International, Inc., and Wyndham Hotels & Resorts, Inc. ("Hotel Defendants") for knowingly presenting and causing to be presented false or fraudulent claims for payment or approval.

93. Hotel Defendants, through their various hotel properties, have knowingly demanded cash and credit card deposits from FEMA Program participants at the time of check in, in clear violation of their participants' rights and FEMA Program requirements.  In some instances, Defendants have also required FEMA Program participants to pay taxes or prohibited resort/destination fees.

94. Hotel Defendants' conscious decisions to have properties participate in the Program while refusing to follow the Program's core requirements has rendered their respective claims to FEMA for reimbursement under the Program materially false and fraudulent.

95.    By virtue of these false and fraudulent claims that Hotel Defendants have submitted or caused to be submitted, the United States has suffered actual damages.

96.    Each of these Hotel Defendants is liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented, subject to any adjustment in the range of appropriate penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

## COUNT II

**Violation of the Federal False Claims Act – 31 U.S.C. §3729(a)(1)(A)
(Asserted Against Defendant Corporate Lodgings Consultants, Inc.)**

97.    Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

98.    This is a claim by Relator, on behalf of the United States of America, for treble damages and penalties under the FCA, 31 U.S.C. §§3729-3733, against Defendant CLC.

99.    Defendant CLC has contracted with the United States to serve as payment agent for FEMA's Program.  In that role, CLC is responsible for enrolling hotels, and managing hotel billing and reimbursement for qualified hotel stays.

100.   CLC has failed to perform any oversight as to whether participating hotels have complied with FEMA's Program requirements, specifically including the requirement that participating hotels allow guests to check in without making a cash or credit card deposit, and without having to pay applicable taxes.

101.   Through its own knowledge, or at best willful ignorance of widespread non-compliance by participating hotels, CLC has allowed those participating hotels to brazenly and openly undermine the Program.  More specifically, CLC has paid claims to participating hotels that it knew or should have known were not eligible for reimbursement, due to the non-compliance of those hotels.

- 18 -

102. As a result, CLC's actions have caused false claims to be submitted to the United States, and the United States has suffered actual damages.

103. CLC, jointly and severally with each respective Hotel Defendant, is liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented, subject to any adjustment in the range of appropriate penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

## COUNT III

**Violation of the California False Claims Act – Cal. Gov't Code §12651(a)(1)**
**(Asserted Against All Defendants)**

104. Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs as though fully set forth herein.

105. This is a claim by Relator, on behalf of the State of California, for treble damages and penalties under the CFCA, against all Defendants.

106. The Program has a cost-sharing component, whereby the federal government pays no less than 75% of the costs incurred by the Program during the course of the major disaster, and the state pays the rest.

107. By submitting and causing the submission of false claims to FEMA, as described in the preceding paragraphs of this Complaint, Defendants falsely inflated the total costs incurred by the Program during the course of the California Wildfire Disaster of 2025.

108. By falsely inflating the total costs to the Program, Defendants also falsely inflated the total value of the California share of those costs. Specifically, Defendants caused the United States to seek reimbursement from California for costs that neither the United States nor the State of California should have been responsible for paying, in violation of Cal. Gov't Code §12651(a)(1).

- 19 -

109.   By virtue of Defendants' conduct, the State of California has suffered damages.

110.   Defendants are liable to the State of California for treble damages under the CFCA, in an amount to be determined at trial, plus a civil penalty for each false claim presented or caused to be presented.

## PRAYER FOR RELIEF

Relator respectfully requests that this Court enter judgment against Defendants as follows:

A.   That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the FCA provides at 31 U.S.C. §3729 *et seq.*;

B.   That civil penalties be imposed for each and every false claim that each and every Defendant presented or caused to be presented to the United States, to the maximum extent permitted by law;

C.   That the State of California be awarded damages in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code §12651(a), plus a civil penalty of not less than $11,463 or more than $22,927 per false claim, adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101-410 Section 5, 104 Stat. 891, as provided by Cal. Gov't Code §12651(a);

D.   That pre- and post-judgment interest be awarded;

E.   That the Court grant permanent injunctive relief to prevent any recurrence of violations of the FCA and CFCA;

F.   That Relator be awarded the maximum percentage of any recovery allowed to Relator pursuant to the FCA, 31 U.S.C. §3730(d), and/or Cal. Gov't Code §12652(g)(1)(C)(2); and

G.    That Relator be awarded all costs and expenses of this action, including statutory attorneys' fees, expenses, and costs as permitted by FCA, 31 U.S.C. §3730(d), and CFCA, Cal. Gov't Code §12652(g)(8).

## DEMAND FOR JURY TRIAL

Relator, on behalf of itself, the United States, and the State of California demands a jury trial on all claims alleged.

DATED:  March 7, 2025

ROBBINS GELLER RUDMAN
&amp; DOWD LLP
SAM S. SHELDON (190502)

SAM S. SHELDON

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
ssheldon@rgrdlaw.com

BARRETT JOHNSTON MARTIN
&amp; GARRISON, PLLC
JERRY E. MARTIN (TN BPR # 020193)
SETH M. HYATT (TN BPR # 031171)
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

Attorneys for Plaintiff-Relator

- 21 -